Tyrus Fields JONES and Robert Wesley Princeler, Appellants,

v.

**UNITED STATES of America,**
Appellee.

No. 8069.

United States Court of Appeals
Fourth Circuit.

Argued April 22, 1960.

Decided May 30, 1960.

John F. King, Baltimore, Md. (court-appointed counsel), for appellant Robert Wesley Princeler.

David I. Absé and Josiah Lyman, Washington, D. C. (court-appointed counsel), for appellant Tyrus Fields Jones.

John R. Hargrove, Asst. U. S. Atty., and Leon H. A. Pierson, U. S. Atty., Baltimore, Md., for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

This is an appeal from the denial of a motion for a new trial based upon after-discovered evidence, the confession of another that he and an accomplice, not the defendants, were the bank robbers.

On a Sunday evening in January 1958, a branch bank in Marlow Heights, Maryland, was robbed. Two armed bandits, wearing "Frankenstein" masks, forced their way into the apartment of the manager of the branch, a Mr. Cranford. They forced Mr. Cranford to accompany one of them to the bank, and, there, to open the night depository. The other, armed with a sawed-off shotgun, remained in the Cranford apartment to guard Mrs. Cranford until receipt of a telephone call from the accomplice to in-

form him that the accomplice had gained possession of the money.

In May 1958, Jones and Princeler were tried and convicted of the crime. The question was one of identification. The Cranfords had picked the defendants out of lineups and identified them as the bandits, despite the fact that when the crime was committed most of the features of the bandits were concealed by the masks. This identification was strongly supported by circumstantial evidence which connected the defendants with two masks, a sawed-off shotgun and a pair of shoes, identified by the Cranfords as having been used by the bandits, and with a severed piece of a barrel of a shotgun which experts testified had been cut from the sawed-off shotgun. The defendants sought, unsuccessfully, to establish alibis.

Jones and Princeler appealed to this Court. We affirmed their convictions, the evidence supporting the convictions being reviewed in some detail in the opinion written by Chief Judge Sobeloff.[1] The Supreme Court denied certiorari.[2]

From January until June 1958, Jones and Princeler were held in the Baltimore City Jail.[3] From February 14, 1958 until April 24, 1958 one McNicholas was also incarcerated in the Baltimore City Jail upon a charge of robbery of a bank in Sparrows Point, Maryland, on February 12, 1958.[4] There was testimony that Jones, Princeler and McNicholas talked together during exercise periods. One of their fellow prisoners testified he overheard Jones and McNicholas discussing plans for McNicholas to take the blame for the crime with which Jones and Princeler were charged. By the testimony of yet another prisoner, the defendants sought to impeach this testimony upon the ground that the witness sought favor in the hope of parole.

In June 1958, McNicholas, then confined in Lewisburg Penitentiary, sought an interview with FBI agents, to whom, on June 16, he gave a written statement in which he said he and an unidentified friend robbed the Marlow Heights bank and that Jones and Princeler were innocent. Some of what little detail there is in this statement was retracted by McNicholas in subsequent statements and testimony.

McNicholas, in August 1958, and Jones, in October, were transferred to the Atlanta Penitentiary. Together there, they discussed their affairs, including the McNicholas confession. They collaborated in the preparation of a written statement, dated December 12, 1958, which McNicholas subsequently signed before a notary. This is the statement which was used to support the motions for new trial.

The District Judge, R. Dorsey Watkins, who presided at the Jones-Princeler trial, did not act on the written motions for new trial, but scheduled a hearing to be held before him on September 11, 1959. For the purpose of this hearing, Jones, Princeler and McNicholas were transported to Baltimore. When the hearing opened, Jones and Princeler moved for a continuance upon the ground that their counsel were not present.[5] The motion was not granted immediately, but McNicholas was sworn and testified. The hearing was then continued to October 23, 1959. The District Court appointed separate counsel for Jones and Princeler, who ably represented them in the four-day hearing which commenced on October 23, 1959 and, on appeal, in this Court.

At the full hearing held in October, McNicholas testified at length, as did

1. Jones v. United States, 4 Cir., 262 F.2d 44.

2. Princeler v. United States, 359 U.S. 971, 972, 79 S.Ct. 886, 887, 3 L.Ed.2d 838, 839.

3. Their trial on these charges was held during this period in May.

4. McNicholas entered a plea of guilty to this charge on March 28, 1958 and was sentenced to imprisonment for 20 years.

5. Jones had engaged an attorney in Atlanta to handle the motion for a new trial. He had a disagreement with her and knew in advance of his trip to Baltimore that she would not be present for the hearing.

Jones, Princeler and a number of other witnesses. McNicholas continued to insist that he and another, whom he still refused to identify, had committed the crime. He testified that the masks and the sawed-off shotgun, introduced as exhibits in the Jones-Princeler trial and identified by the Cranfords, were not those used by him and his accomplice. His testimony contains some detail which counsel contend would support a finding that he was present in the Cranford apartment. It also contains some discrepancies and is contradicted in part by other testimony and his own prior statements. What knowledge of the Cranfords and of their apartment he displayed could have been acquired from Jones and Princeler and from his reading of portions of the transcript of the testimony at the Jones-Princeler trial.

A psychiatrist, who had examined McNicholas in 1958, testified he was a neurotic of above-average intelligence who sought punishment for antisocial conduct. He expressed the opinion that confession of a crime he had not committed would be consistent with his behavior pattern.

At the conclusion of the hearing, the District Judge reviewed the testimony, noted that the attitude of McNicholas was "unappetizing and unpersuasive," and found that his story was inherently improbable and unworthy of belief. He denied the motions.

█ It is first contended that there was a denial of constitutional rights when testimony of McNicholas was taken on September 11, 1959 when the defendants were without counsel. We think this record raises no constitutional question, however, for the defendants, in fact, were provided counsel who actively participated in the full hearing held in October.

The District Judge, having arranged the transportation of the three prisoners to Baltimore, appropriately inquired whether McNicholas, as a witness on the stand, would support his confession or recant. The need and the scope of a further hearing were dependent upon what McNicholas had to say. When he was present in the court, this was properly determined by taking his testimony. The District Judge then rescheduled the hearing for October 23, 1959 and, in the meanwhile, appointed experienced and able attorneys to represent each of the defendants.

The subsequent hearing in October was full and complete. McNicholas was extensively examined and cross examined and the defendants were very effectively assisted by able counsel. There was scrupulous regard for the rights of the defendants and nothing which we can find in any of the proceedings which was unfair or prejudicial to them.

The principal contention on appeal is that the District Judge, in acting upon the motion, had no right to consider the credibility of the proffered evidence. Essentially, the position is that the inquiry of the trial judge, in considering after-discovered evidence, is limited to the diligence of the movant,[6] the admissibility of the evidence and its materiality if it should be accepted as true. Since the McNicholas testimony would have been admissible if it had been offered at the trial and would have produced a different result if it had been accepted as true by the jury, it is said that however unlikely it may be that a jury would believe such testimony, it was beyond the discretionary power of the trial judge to deny the motion.

Doubtless, it is true that where the after-discovered evidence consists of admitted fact, a court should hesitate to choose between permissible ultimate inferences without regard for the traditional function of the jury.[7] If, as was the case in Griffin, the fact discovered by the defense after the trial was known to the prosecution and suppressed by it so as to

6. The District Attorney suggests a lack of such diligence here, but the District Court did not pass upon that question.

7. Griffin v. United States, 336 U.S. 704, 69 S.Ct. 824, 93 L.Ed. 993.

**436**

impair to some extent, the fairness of the trial, the area in which the trial judge may exercise his discretion to deny the motion may be further circumscribed.

Where there is a grave question of the credibility of the after-discovered evidence, however, the role of the trial judge is that of the fact-finder, so much so that the Supreme Court has said an appeal from his resolution of the facts should be dismissed as frivolous.[8] The rule has been applied where, as here, a third party confession is the after-discovered evidence upon which the motion for new trial is founded.[9]

■■ This remedial procedure, a motion for new trial based upon after-discovered evidence, is designed to serve the ends of justice. It is made available as a means of relief from manifest injustice. That purpose would hardly be served if the law required the trial judge, who heard all of the evidence and saw all of the witnesses, to assume that a jury would believe testimonial evidence however improbable and unworthy of belief he finds it to be. If the purpose of the remedy is to be served, without subjecting it to undue abuse, the trial judge who approaches the question of the probable effect of the new evidence upon the result, in the event of a new trial, should be vested with a broad discretion in considering matters of credibility as well as of materiality. Stringent or artificial limitations upon the exercise of the discretionary power of the trial judge to grant new trials could only subvert the purpose of the remedy.[10]

The contention is also made that the McNicholas testimony is so persuasive that the District Court could not reasonably conclude that a jury which heard it, with all of the other testimony, would probably convict Jones and Princeler. In an oral opinion, delivered at the conclusion of the hearing on the motion, the District Court reviewed the facts and noted the infirmities in the McNicholas story and its lack of corroboration. In the light of the evidence that Jones and Princeler were the culprits, we think the analysis of the facts by the District Court was entirely reasonable and his conclusion within the range of his discretionary power.

Affirmed.

8. United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562.

9. Jeffries v. United States, 9 Cir., 215 F.2d 225; Connelly v. United States, 8 Cir., 271 F.2d 333.

10. See United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562.